2336, Arista v. Cisco. I guess you get to stay in the same place, which we will do throughout. In this portion of the argument, I will only address Claim 2 of the 577 patent. That is the subject we're appealing, and they are cross-appealing on all the other claims, and I will handle that in rebuttal. With regard to Claim 2, it's a single issue, and that's whether Huey discloses this parallel using a pipeline system in parallel. There is no debate. Claim 2 is one that adds the parallel pipeline limitation. There is no dispute that Huey discloses in Figure 4 a pipeline system where it moves from left to right from the various stages of going from the address handler to the cell router to the cell policer. There is no debate that that's a pipeline system. The only question below is whether that was operating in parallel. The board did not find that it was not operating in parallel. The board simply said, we don't see the words in parallel or anything to that effect. We don't see an explicit disclosure, which doesn't answer the question. The question is whether one skilled in the art reading Huey as a whole would understand that that pipeline system was operating in parallel, i.e., that when Packet 1 moved from Stage 1 to Stage 2, that the system was operating on Packet 1 in Stage 2 at the same time as the system was operating on Packet 2 in Stage 1. That's the question, and that question is answered definitively by Huey, albeit not in words that the board understood to be in parallel, when it said that at Column 9 that that comparison being done in Stage 1 is done, quote, in real time, meaning those packets are flowing through, not going through one packet and then waiting until full processing and then sending the other packet, that they are flowing in real time. And that question is also answered by Huey, Column 3, telling you that there's a stream of cells going through at the cell input rate. And that answers the question as to whether, in fact, those cells are progressing through that pipeline and being operated on in parallel. Was there an expert declaration commenting on Columns 3 and 9 to the effect that you're telling us now? The expert testimony is Dr. Chow, Arista's expert. It was in his deposition. It was not a report on that question, but he was asked about this exact issue. That's in the record at Appendix 2404. That's where we cited it. His testimony is at 1788-89. That's unrebutted testimony, where he says that is in parallel. And that's the interpretation of one skilled in the art of how something is operating in real time, meaning those things are flowing through. Beyond that... Did you say 2404? 2404 is where we cited it. The testimony itself is at 1788-89. Beyond that, we cited the long reference called KOGGE, which is at 3298. That was a 1981 treatise establishing that it was well recognized in the art long before this time that, in fact, the flow through those stages in a pipeline system would, as KOGGE said, just be limited to the rate at which it's fed into the input. So it's flowing through, operating on stage two, at the same time they're operating on a different packet in stage one. That is in parallel, so the board's refusal to find that Huey satisfied the parallel limitation simply because it didn't use the words was a failure of the board to recognize the import of the Chow testimony and the KOGGE reference. The KOGGE reference we're not using as a combination. We're merely using it to show how one skilled in the art would have understood the operation of a pipeline system. And the board's failure to recognize that, simply relying on the absence of language, was error. Thank you. You weren't planning to re-discuss the assignment stopper issue? I wasn't planning to. Thank you, Chief Judge Paros. May it please the court. And as Your Honor noted, for the reasons I just discussed, the board should have applied the doctrine of assignment stopper, but I'm not going to reiterate those arguments, other than to say, if ever there was a case for assignment stopper, this is it. It's a patent that Dr. Cheridan and Mr. Bechtolsheim assigned to Cisco. They then founded Arista, and then Arista now wants to invalidate the patent. Can you tell me what the nature of the assignment was?  And then, you know, for a salary and benefits, the company gets to retain the fruits of your labor, including anything that you come up with if there are any patents that are gained. They belong to the company. They don't belong to the employee. Judge Shin, let me just put it this way. Both of these individuals were very handsomely compensated by Cisco. That is detailed in the record. Not that I think anything turns on whether or not this is just a normal employment assignment, because I think this court's case law is very clear that that is sufficient. I suppose it could be characterized this way, but I think that there was more going on there. But again, I think that if you look at the points in the record that we've articulated, you'll see that they were very compensated by Cisco for the inventions that they assigned to Cisco, and then they went off in a founded arista and now seek to profit from invalidating these patents. Now, separate apart from Assign-Restoppel, there are three reasons that this case should be reversed or at least remanded. First, it's the board's treatment of the in-response-to limitation as merely requiring a sequential rather than a causal relationship. Second, the board's failure to require that the alleged access control patterns actually be used for access control. And third, its failure to require hardware enforcement of access control. Any one of these provides an independent basis for reversal or remand, and any one of those would also address Claim 2 of the patent. So I wanted to take each in turn. Now, the claims require generating an access result in response to a match between a packet label and the access control pattern. And you didn't see construction of the term from these points to the left. Well, Chief Judge Crose, you won't see us asking for one under the heading of claim construction. Please construe this term the following way. But I think this is exactly like what this court recently addressed in HTC versus cellular communications, 877F3 at 1367, which came down in December. And it's just like the issue that was in VIZIO versus ITC, which is where you have the board engaging in an implied construction. Yes, it may have been teed up in the context of arguing non-infringement, and that's exactly what was at issue in VIZIO. And the majority there over the dissent said, no, this still presents an issue of claim construction. And to be clear, there's no doubt that this issue was teed up and that the board understood that the issue went to what the scope of the claims were. Okay, so I don't want to use your time, but assuming we would agree with you that in response to requires causation, why would we change the result? Why would that change the result? Oh, so for fundamental reasons, Chief Judge Prost, because if you agree that it requires causation, there is no causation here between what the board is treating as the access control match and then the access determination. And perhaps the best way to see this, the board treats the VCVP header match as being... You want to refer us to the page in the board's opinion? I believe that is right, Chief Judge Prost. If you look at appendix 26 and appendix 27, it is where the board is addressing this issue. And the alleged access control pattern are the VCVP addresses. And the board then says, and this is appendix 27, the VCVP addresses used to make a match are not required to also generate the access result. Now what that means, and this is important, the VCVP addresses are what are being treated as the access control pattern. It is then this cell policer in Huey being combined with the ATM uni-specification, that is what is making the access result decision, the alleged access result decision. And what is happening is that packets with the exact same VCVP headers, that is whether they have the exact same match, those packets will be treated differently in the cell policer. Some being discarded and some not based on a traffic contract that has nothing to do with whether or not there is a VCVP match. To put it differently, what's happening here, just to give an example, it's as if I go to a movie theater, I buy a ticket, they look at the ticket, they see it's a match for the theater, I go into the theater, halfway through the theater I start talking, they ask me to leave. The reason I'm being asked to leave is not in response to me buying a ticket and the ticket being a match for me to be in the theater. The reason I'm being asked to leave is because I'm talking. And I guess the other side or maybe the board's rationale is you never get filtered out of the movie theater unless you first buy a ticket to get into the movie theater. And so in a larger sense, maybe not in the specific sense that you're talking about when you're talking in the theater, but in a larger sense, you are getting removed from the theater in a way that's dependent on you getting into the theater in the first place. Is that kind of what the board is trying to say? I think that is the way that the board is approaching this. And to be sure, buying the ticket and being admitted to the theater necessarily precedes the decision. But the decision that is then being made, it does not turn on. And yes, I wouldn't be there if I hadn't bought the ticket. But the decision being made to kick me out of the theater is just like what the cell police is doing. It is making a decision that in no way, shape, or form turns on the match. And again, the best way to understand that is that you can have packets that would have an absolutely identical match. And they are being treated differently for reasons that have nothing to do with the match. And that is entirely what the decision is. And that feeds into my second argument, which is that the alleged access control pattern here, the VCVP heading, it's not being used for access control. And in fact, Arista's response on appeal isn't to defend the board's rationale, other than to say that the term access control pattern encompasses, quote, any string of bits stored in the cam. That's at page 27 of the yellow brief. That makes that limitation absolutely meaningless. And that is exactly what we argued below it could not be at appendix 1569 to 1570. That's like reading the thumb out of Thumbswitch in Enry man-machine interface. I guess the idea is these access control patterns, they're basically codes that you match up with whatever the packet label has. That's exactly right. It is, look, the prior art here. And if you do have a match, then a few other steps happen before you decide whether that packet gets filtered out. As opposed to the fact that you have the match or not being what decides if the packet's being filtered out. And that's the problem. What the patent contemplates, and what's very clear is that the decision, and if you look at column two, lines 33 to 35, the match is from the information in the packet header. That's what's used to enforce access control. If there's a match, and it can be set up either way. A match could be to include, a match could be to exclude. But let's just use it for inclusion for a moment. If there is a match, then you should be admitted, you shouldn't be discarded. End of decision. But that's not what happens in the asserted prior art. You have a match, and then there is a separate discard decision that is in no way, shape, or form related to, and doesn't turn on what the match decision was. That's the fundamental problem here. Now again, there is a mismatch in trying to use this ATM technology in order to try to read on this patent. And I think that's part of why you end up with the mismatch here, because the VCVP header isn't the type of thing that's being used for access control. It is literally just being used for a traditional type of routing decision. And if the header, if there is an inconsistency of the header, it doesn't know where to go. There is some kind of matching that is going on. Well, only in the sense that the system, if you don't match the VCVP heading, the system doesn't know what to do with you. It doesn't know how to route you, and so therefore it gets discarded, because you're not on the virtual path that you're supposed to be on. That's what's going on. But that's not what they are relying on for the access decision. The access decision, they rely on the cell policer. The cell policer relies on a traffic contract, i.e., have you exceeded your bandwidth? Have you sent too much data? And so the exact same match gets treated differently. So for those reasons, the court should absolutely reverse and remand this issue, which was squarely teed up before the board. Again, if you look at Appendix 3722. Now, our final argument on this is that the board's failure to require the relevant steps of the 577 patent to be conducted in hardware cannot be reconciled with the patent itself. This is analogous to the decision this court had before it in Vernetics. You have the title, the abstract. You have every embodiment that requires, quote, hardware processing of ACLs and hardware enforcement of access control, and you have repeated disparagement of any use of software for these features. And those are exactly the kind of indicia that this court intends to use. Any use or just the matching? Well, actually, there's an important point there, Judge Chin. The argument that Arista made below was that the only thing that had to be done in hardware was the maintaining, not even the matching. And the board relied on that as well. That's at Appendix 25. You can see that. And Arista's argument below was at 2395. Now, on appeal, they've conceded that, well, the matching should be done in hardware. I think that concession alone should result in a remand here. That's at their yellow brief at page 16. Because, of course, the claims don't specifically refer to the matching in hardware any more than any of the other steps, yet they recognize implicitly that it would make no sense and the invention wouldn't work if the matching wasn't being done in the hardware. But that was a point that they contested below and that the board went a different way on below. And that alone should give you a remand. I think the other point here is that the patent specifically and repeatedly disparages any use of software. And that's both for the processing and the enforcement. And if you look at Column 2 in particular, there are three different passages, one at line 3, one at line 14, and one at line 47. And each one of those talks about the prior art still having the drawback of using software or requiring at least some software enforcement, and that the invention permits or denies access without the need for software processing. And these kinds of repeated distinctions and disparagement are exactly what this court in pacing technologies and recently in Honeywell made clear. You're eating into your rebuttal. Do you want to say something about claim 2? Why isn't the discussion of real time telling us that there are packets being operated on in different places in the pipeline? Sure. A couple of points. I mean, this is entirely a substantial evidence issue. And the arguments that they make about their expert are points where the board actually rejected the factual underpinnings of Arista's expert evidence. And the board addresses this at Appendix 32 to 33, rejecting the argument that Column 8 discloses parallel actions. Given that I'm into my rebuttal time and given that the issues that I'm arguing would supersede and address claim 2 as well, I think I'd rather save the rest of my time for rebuttal. Thank you. I'd like to begin with the hardware issue, if I may. The hardware issue is their position now is that all steps of the method and all parts of the apparatus must be performed in hardware. That was not their position below. It is also not what the claim says. The claim specifically says that one part has to be done in hardware. That's that maintaining and matching step. That's the cam. That's where the ACLs look up and matches are done. That is in hardware in the claim. Nowhere does the claim say anything else has to be in hardware. And that omission I propose should be dispositive, where the claim says X is in hardware but is silent. That's never the end of a claim construction exercise. It never is the end of the exercise. It ought to be the ultimate end of the answer, in my view. But obviously, you have to look at the specifications. And here, they're arguing for a specification disclaimer, as they must. The title says doing this processing in hardware. The abstract leads with we're going to do hardware processing. There is no question that a central purpose of this claim was that you're doing that matching step in hardware. That is the whole point of the invention. That's what they said was their invention. It was not that the entire process is done in hardware. The whole point, when you look at every step where they're criticizing software, and if you look at, he cites columns 3, 14, and 47, lines 3, 14, and 47 in column 2, every single one of those is talking about the ACL lookup matching process, ACL processing. That's the CAM. So there is no question at all that the central focus of this invention was on doing that step in hardware, because the CAM allows you to match up thousands of entries quickly, where software does not. But a step of taking the output of that and making a go-no-go decision, that's not the same thing as the very complicated nature that a CAM is required for. And the specification nowhere says so. And so the specification disclaimer argument, A, was not made below. Let's just be very clear about that. The board, in fact, said so. It was not made below. Now, they're trying to make it here. It has a very, very high burden. If you allow them to make it here, the question is, does the specification read as a whole amount to such a disclaimer? Every time they're criticizing software, it's about the ACL matching step, the ACL processing step. That's the part they're criticizing, and that's the part they put in the claim. So those are consistent. They do not support a broader disclaimer that other steps also have to be done in hardware. And if there's any question about this, what they're trying to say is there are portions of the specification that say we can eliminate the need for software processing. Undeniably true. Software processing of those ACLs in step two, which is matching. Now, if there's any question that they're wrong, that that means that that amounts to a disclaimer about all steps, that is answered by column five, lines one to six. Column five, lines one to six. Express the requirements for software processing in step three, where you're doing the access result. And it's set up by the bottom of column four. And the bottom of column four says, in some cases you may want to have additional software processing. And it says the higher level processor specifies whether the packet 130, after processing by the higher level processor, is forwarded to a selected output interface or is dropped. That's the access result in step three. So the patent certainly cannot clearly support patent... Can we get to the more mind-bending question of whether Huey teaches the... In response to? In response to. I'm happy to. So in response to, the issue really then comes down to, does in response to require that it be specifically generating the result? And that's not what the claim says. The claim has, and the board nailed this one, and with really specific reasoning. They made exactly the same argument below that they're making here, that it had to be, that the matching, that the address or the pattern had to be used as part of that process. Huey's policer doesn't care what the VP address is, right? When it makes a choice to filter out various packets. It does not care. It does not care. But that is also true of the patent. If you look at the bottom of column four, what is sent to their policer, if you will, is not the IP address, which is their analog. What is sent is, quote, an indicator. So it's not the address. They're sending exactly the same thing that Huey is sending, something that is the result of the match, but not the match itself. The argument that is being made to you here is that Huey doesn't satisfy the claim because the VP-VCI address does not then be forwarded to the policer who uses that address to make a decision based on the content of that address. That's the argument that's being made. That is not what the claim says. If that's what they wanted to say, it was easy to write that. They chose broader language, and they're stuck with that broader language. And the broader language is merely in response to it. And their argument... Let me get this straight. The claim, they find a match, or multiple matches. Yes. And then each match has some priority value attached to it, right? If we're talking about the patent, yes. Yes, about the patent claim. And so based on whatever priority value that is, which is representative, I assume, of what the access control pattern is, then you make the access result decision. In response to that selected match. Right. So there... I guess you could argue there's a stronger connection between that access result and the identity of the access control pattern in the cam compared to Huey's policer and the choices it's making when it is filtering out data packets. Is that fair to say? I don't think it's fair in the light of Column 4. Because what Column 4 tells you is you're not sending that address. You're not sending the address, but you're sending something else that's representative of the address. True. It's an indicator. It's an indicator. It's an indicator, and it says what the indicator does. The indicator either specifies that the packet is forwarded, or the packet is dropped, or the packet is forwarded to the processor for further processing. It doesn't send the address. And their argument to you here was that address has to be used. That's the argument they made to the board. And that address has to be used in Step 3 to generate the result. You look up the address, you say, ah, this result means X. That's not what Column 4 says. That is squarely inconsistent with Column 4. And Huey is very consistent with Column 4. The address itself is not sent. And in response to is clearly true. It is in response to the fact of the match. And the board's reasoning here I think is perfect. If that match had not been made, that decision would not be made. It is clearly relevant in a but-for sense. But it's also not just a random but-for sense. It's its purposeful architecture. That match determines whether it's sent to the policer or not. That's the purpose of sending that match. It is to allow the policer then to make the decision, which is exactly the same purpose in the claim. What factors does the policer use to decide which packets it's going to filter out? In Huey? In Huey. In Huey, it's the basis of what information is sent in its indicator, if you will. I don't understand. What's sent is not the address. What's sent is an indicator as a result of the match. Representatives of a whole bunch of data packets. Representatives of various data packets. And how Huey makes that decision of which ones to drop or send, that I don't know. But I don't think that is relevant to the question. The question is, does it make that decision in response to the fact that it's sent to it? The whole point. It's not just a random effect. It's not an accidental effect. It's a designed, architected effect. The purpose of that matching step is to send it to the Huey cell policer for the purpose of making that decision. That is its purpose. So it's not, as I say, accidental. And it's not unconnected. That's the structural design. And I think that's important to understand. Because that takes it away from their argument that it's just a happenstance. It has no connection to it. That's clearly false under Huey. So with regard to... I do want to make one additional point. That there is substantial evidence to support the board's finding, even under Cisco's new construction. And that's because there's no dispute that Huey teaches that a cam performs maintaining and matching steps. So we're done with that. So the question is really the cell policer. And the question is, is the cell policer hardware or not? So this goes to the hardware issue. Huey teaches it's part of the port. That's hardware. Both experts say we can't tell whether it would be done in hardware or software from Huey itself. It could be either. Both experts acknowledge that. And there were specific teachings in timely prior IEEE articles that we cited to the board, saying you would want to do hardware because it's fast, cheap, and simple. Exactly the reasons they said hardware's better. That was known in 1991 in these IEEE articles. So the only thing that's missing from Huey is a specific disclosure of whether that process of the cell policer is done in hardware or software, with the implication that it's part of hardware because it's part of the port. IEEE clearly teaches that one skill of the art would have... It would have been obvious to them to do it in hardware. The board did not say any of this, right? The board did not say any of it because it disagreed with the hardware limitation. And at the time, they weren't even making this same hardware limitation. What they were arguing about the cell policer was that it wasn't done in the cam. They weren't arguing that the cell policer had to be done as part of hardware, separately. That's a new argument here. The argument there was quite different. So it's not one of these hidden claim construction issues. It's a new argument. Okay. We're essentially out of time. You have one other point to make? I want to make one quick point on Asano Restopil, if I may. Okay. It has nothing to do with what I've argued before. It has to do with the factual predicates of Asano Restopil, which is an argument that my friend made with respect to this patent. Asano Restopil has significant factual predicates that this record is lacking. The specific role that the Asano-ers had in designing the accused instrumentalities, that evidence is scant. In fact, that evidence is limited to Dr. Cheriton had substantial involvement in software. Well, that's an initial matter. That's inconsistent with our hardware-software argument. But it has nothing to do with the accused instrumentalities, specifically. So they have failed miserably in establishing the record that would be required to support Asano Restopil. And as your honors know, we have, and I'll leave that for the briefs, we believe that Asano Restopil should not be applicable, that this court should en banc in order to say that Asano Restopil is no longer applicable post-Lear. And in the facts of this case, even under this court's current law, Asano Restopil should not be applicable. But the record is not built out on that question. Thank you. Thank you. Thank you, Chief Judge Prost. On the last point that my colleague was making, just to be clear, if you look at this court's decision in Mentor Graphics at 50F 3rd 1376, it rejects the notion that the assigner had to be involved in developing the allegedly infringing features in order for Asano Restopil to apply. And there's no currency to that argument. Now, turning to the hardware arguments, first, there are no alternative grounds for affirmance that could be done here. The issues that my colleague was talking about were disputed at Appendix 1667 to 1670. Our expert addressed that issue at Appendix 2508. Now, addressing the hardware issue, the hardware issues that Mr. Powers started with, first, there's no waiver here. I mean, let's be clear. In the reply below, they understood what our argument was.  Contrary to Cisco's contention, not every step of the challenge claims must be performed in hardware rather than software. That argument was clearly teed up, and the board understood it at Appendix 24. It said, we argued that, quote, the claims are limited to performing access control in hardware versus software. Second, so much of the argument today that Mr. Powers has made is about the matching step taking place in hardware. Well, that's not what they argued below. Below, they argued that the only thing that had to be in hardware was the maintaining step, and I'd encourage you to look at Appendix 2395, where they said, quote, the only hardware element required for any step is the associative memory that is used for maintaining a set of access control patterns. The board relied on this, and if you look at Appendix 25, the board didn't require that the matching take place in hardware. What we're hearing today, and rightly so, that at least the matching has to take place in hardware, and given that, that's a reason at a minimum to remand. Now, in terms of new arguments, we heard a very new argument today based on Column 5 of the patent. That's not an argument that ARISTA made in its brief. The Column 5 discloses the processing take place in software, and that's not what's going on. If you look at the passage at the top of Column 5, this is talking about additional processing that could be done after the elements of the claim are satisfied. This is saying there are more things that you could potentially do that are being disclosed here. Nothing that's here at the top of Column 5 goes to the claimed elements themselves. If I may, Chief Judge, perhaps one last point, and my last point is in response to, to be clear, Huey's Policer doesn't care whether or not there was a match. In the patent, the access result depends on the fact that there has been a match, and the fact there's been a match is what tells you what to do. That is not what Huey's Cell Policer does. It doesn't take its action based on the fact that there's been a match. Thank you. Thank you, Chief Judge First. The case is submitted.